---

JESSE BROWN, JR.,                    1:16-cv-04602-NLH-AMD

        Plaintiff,

                               **OPINION**

    v.

RAILROAD GROUP LIMITED
LIABILITY COMPANY, et al.,

        Defendants.

---

**APPEARANCES**:

CAROLINE HOPE MILLER
SAMUEL CORDRAY WILSON
DEREK SMITH LAW GROUP PLLC
1845 WALNUT STREET
SUITE 1600
PHILADELPHIA, PA 19004

    *On behalf of Plaintiff*

JOSEPH G. ANTINORI
BROWN & CONNERY, LLP
360 HADDON AVENUE
PO BOX 539
WESTMONT, NJ 08108

    *On behalf of Defendants*

**HILLMAN**, District Judge

    This matter concerns Plaintiff's claims of race discrimination and retaliation by his employer. Presently before the Court is the motion of Defendants for summary judgment. For the reasons expressed below, Defendants' motion will be granted.

**BACKGROUND**

Plaintiff, Jesse Brown, Jr., is an African-American male who began working for Defendants, collectively hereinafter "Railway Construction" or "Defendant,"[1] as a laborer in April 2010.  Plaintiff alleges that during his time at Railway Construction, he was discriminated and retaliated against because of his race,  Defendant did not address any of his complaints, and due to the hostile work environment, he was forced to quit at the end of May 2014.

Four events serve the basis for Plaintiff's claims: (1) between May 2013 and April 2014 Plaintiff claims he was drug tested a disproportionate number of times as compared to white employees, and Defendant did not properly investigate his complaint about the practice; (2) Defendant gave Plaintiff a verbal warning about his attendance, which Plaintiff claims was humiliating because they did it in front of co-workers; (3) Plaintiff discovered a noose in the bolt trailer he was directed to organize, and Plaintiff claims that Defendant did not properly investigate; and (4) two weeks after the noose incident, Plaintiff was involved in an altercation with a white

---

[1] Plaintiff has named as Defendants 3D Railway Services, LLC, Chris Daloisio, James Daloisio, Sr., Railroad Construction Co. of South Jersey Inc., Railroad Constructors, Inc., Railroad Group Limited Liability Company, Dennis Riggs, Sr., Steven Riggs, and Brian Sheehy.

co-worker, who punched Plaintiff in the face and was terminated from employment, but that white employee was rehired two months later, which Plaintiff claims evidences Defendant's discriminatory animus and caused his constructive discharge.

Plaintiff has brought claims pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166 ("Title VII")), and 42 U.S.C. § 1981.[2] Defendant has moved for summary judgment in its favor on all of Plaintiff's claims.  Plaintiff has opposed Defendant's motion.

## DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or

---

[2] This Court has subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367.  Plaintiff's complaint contained claims for violations of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq.  Those claims were dismissed because they were time-barred.  (Docket No. 13.)  Plaintiff also asserts that he is bringing his claims pursuant to 42 U.S.C. § 1983. That provision is not applicable here because Defendants are not state actors.  Leshko v. Servis, 423 F.3d 337, 339 (3d Cir. 2005) (explaining that to state a claim of liability under § 1983, a plaintiff must allege that he was deprived of a federal constitutional or statutory right by a state actor).

interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict

4

those offered by the moving party.  <u>Anderson</u>, 477 U.S. at 256–57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001).

## C.  Analysis

Plaintiff's complaint presents three types of Title VII[3] claims: discrimination, retaliation, and hostile work environment.[4]  With regard to his discrimination claim, in order to state a valid claim for disparate treatment on the basis of race, Plaintiff must show: (1) he belongs to a protected class; (2) he suffered some form of adverse employment action; and (3) the adverse employment action occurred under circumstances that give rise to an inference of unlawful discrimination.  <u>Barnett v. New Jersey Transit Corp.</u>, 573 F. App'x 239, 243 (3d Cir.

---

[3] Under Title VII of the Civil Rights Act of 1964, it is unlawful for "an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment ... because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. § 2000e-2(a)(1).

[4] As noted above, Plaintiff also asserts claims pursuant to 42 U.S.C. § 1981.  The substantive elements of a claim under § 1981 are generally identical to the elements of an employment discrimination claim under Title VII.  <u>Brown v. J. Kaz, Inc.</u>, 581 F.3d 175, 181–82 (3d Cir. 2009).  The Court will therefore not conduct a separate analysis of Plaintiff's § 1981 claims because the basis for those claims is the same as Plaintiff's Title VII claims, and Plaintiff's § 1981 claims fail for the same reasons as his Title VII claims.

2014) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)) (other citations omitted).  An adverse or "tangible" employment action is "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  <u>Id.</u> (quoting <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 761, (1998)).

As to Plaintiff's retaliation claim, to establish a prima facie case of retaliation under Title VII, Plaintiff must show that: (1) he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action.  <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 340-41 (3d Cir. 2006) (citation omitted).

For Plaintiff's hostile work environment claim, "whether an environment is 'hostile' or 'abusive' is determined only by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  <u>In re Tribune Media Company</u>, --- F. 3d ---, 2018 WL 4212086, at *9-10 (3d Cir. Sept. 5, 2018) (citation and

6

alterations omitted). To prevail on a hostile work environment claim, a plaintiff must show (1) the employee suffered intentional discrimination because of his race, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and, for the employer defendant, (5) the existence of *respondeat superior* liability . . . ." Id. (citations omitted).

If a prima facie case is established for each of these claims, the burden of production shifts to the employer to present a legitimate, non-discriminatory reason for its actions. Parker v. Secretary United States Department of Veterans Affairs, 676 F. App'x 101, 104 (3d Cir. 2017) (citing Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015)). This is a "relatively light burden." In re Tribune, 2018 WL 421086 at *12 (citation omitted).

If such a reason is offered, the burden shifts back to the plaintiff to demonstrate that the reason was merely pretext and that discrimination was the real reason for the adverse employment action. Parker, 676 F. App'x at 104 (citing Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) ("[T]he non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'"")).  Although the burden of production shifts, "the plaintiff has the ultimate burden of persuasion at all times." Id. (citing Daniels, 776 at 193).[5]

In this case, even accepting that Plaintiff has established his prima facie case for each of his three claims, Plaintiff has not demonstrated the existence of material disputed facts to cast doubt on Defendant's proffered legitimate reasons for its actions.

First, with regard to Plaintiff's contention that he was drug tested more times than white employees and Defendant did not properly investigate his complaint, both of which evidence Defendant's racial bias toward him, the undisputed facts do not support Plaintiff's claim.  According to Defendant's policy, as well as the policies of the companies Defendant performed work for, such as SEPTA, employees were subject to annual, random,

---

[5] It is important to note that under Title VII, a plaintiff's burden is different for a discrimination claim and a retaliation claim.  Status-based discrimination on the basis of race, color, religion, sex or national origin can be proven using the motivating factor standard, while claims that an employer retaliated on account of an employee having opposed, complained of, or sought remedies for discrimination must be proven using the stricter "but-for" standard.  DiFiore v. CSL Behring, LLC, 879 F.3d 71, 77 (3d. Cir. 2018) (discussing University of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338, 360 (2013)).  Plaintiff has not met either standard for his Title VII claims.

and job-specific drug tests.  Random drug tests were performed once a month.

During the time period Plaintiff claims he was tested disproportionately to white employees – May 2013 through April 2014 – Plaintiff was tested seven times:

- 05/16/13 – PATCO training/annual drug test
- 06/24/13 – Random
- 07/15/13 – Testing required of all on-site employees by Defendant's client, Enbridge.
- 08/14/13 – Random
- 11/12/13 – Random
- 12/11/13 – Random
- 04/21/14 – PATCO/annual drug test.

(Docket No. 47 at 5.)

In the Fall of 2013, Plaintiff complained to Defendant about his perception that he was being drug tested more often than other employees.  Defendant explained to Plaintiff that Defendant did not select which employees would be randomly tested.  Defendant explained that an outside company, DISA, handled Defendant's drug testing, including the random selection of which employees would be drug tested each month.

Plaintiff claims that he felt that he was being drug tested more than other employees based on speaking with several co-workers, who told Plaintiff that they were not tested as often.

Plaintiff, however, has provided no evidence other than his own speculation that (1) he was randomly drug tested more often than other employees, and even if he had been, (2) that he was targeted because he is African-American.[6] Plaintiff's subjective perception of his mistreatment based on his race is insufficient to cast doubt on Defendant's explanation for Plaintiff's drug testing. See Charles v. Mott's LLP, 2018 WL 2002794, at *3 (D.N.J. 2018) (quoting Hicks v. Tech Indus., 512 F. Supp. 2d 338, 348 (W.D. Pa. 2007)) (other citation omitted) ("Speculation is simply not evidence of discrimination," and "[n]umerous courts have opined that a plaintiff's subjective perception of discrimination, standing alone, cannot defeat a defendant's motion for summary judgment.").

Similarly, Plaintiff relies solely upon his own perception that his race motivated Defendant to gave Plaintiff a verbal warning about his attendance in front of his co-workers, which humiliated him. On January 2, 2014, Plaintiff received a verbal reprimand at a work site regarding Plaintiff's absences from work. Plaintiff's supervisors called Plaintiff from where he was working over to the side of the road 50 feet away, and they

---

[6] One of Plaintiff's co-workers who told Plaintiff that he had not been drug tested as often as Plaintiff is also African-American. Plaintiff has not provided any evidence that African-American employees were randomly drug tested more often than white employees.

spoke for fifteen to twenty minutes.  Plaintiff admits he was calling out of work because the weather was poor and there was a lot of snow.  Plaintiff also admits that his supervisors did not raise their voices or make any exaggerated movements.

Plaintiff has not provided any evidence that his co-workers overheard the discussion, and he does not refute that they were near the highway and railroad tracks, which were very loud. Plaintiff also does not point to evidence that would suggest his race played a part in Defendant's motivation for speaking with him about his attendance.  That Plaintiff felt singled out and embarrassed, without any evidence suggesting that race was a factor in Defendant's actions, is not an actionable race discrimination claim.  See id.

Next, with regard to Plaintiff's claim that he and co-workers discovered a noose in the bolt trailer, and Defendant did not properly investigate how the noose got there and the serious racial implications of the noose, Plaintiff fails to show that Defendant's handling of the situation was affected or influenced by improper motives.  On January 23, 2014, the yard foreman, Barry Fox, sent Plaintiff and three other employees, Plaintiff's uncle Ronald Brown, Tosha Roots, and Mark Brooks, to the bolt trailer to sort the bolts.  That job was given to employees when work was slow.

When Plaintiff entered the trailer, he and his co-workers

saw the slip-knotted rope, which was nailed to the side of the
shelf and hanging like a hangman's noose.  Plaintiff asked the
yard foreman to take down the noose because it was intimidating.
Plaintiff and his uncle then reported it to the safety manager,
who prepared the following memo:

> Yesterday (01/23/2014) Dennis Riggs reported that Mr.
> Ronald Brown had brought a small piece of tattered rope
> that had a slip knot and loop on it which Mr. Brown
> interpreted to be a hangman's noose to Mr. Fox's (Yard
> Foreman) attention, stating that it was directed towards
> him and people of color.  Mr. Fox brought it to Mr. Riggs's
> attention (superintendent) who reviewed the small rope
> which was discovered in the bolt trailer.  Mr. Riggs felt
> it was probably used to hold a door open and had no other
> intention other than just that.
>
> Mr. Ronald Brown and Mr. Jesse Brown felt it was directed
> towards them as they felt it was meant towards people of
> color.  Mr. Riggs felt that since no other rope of this
> kind had been found in the past and literally anyone could
> have used it as a slip knot for the door as he didn't
> believe It was a threat of any kind, since there have been
> no previous incidents of this kind on the company grounds
> in the past.
>
> In addition, it was determined that we would keep an eye
> out for such items of this nature and items of any threat
> within our workplace.
>
> Note: The yard is not a typical workplace on a day to day
> basis for any company employee with the exception of the
> yard foreman who manages the day to day needs of our
> operations regarding materials for our field projects.

(Docket No. 47 at 10.)

Plaintiff contends that Defendant's response to the noose
was insufficient and demonstrates race discrimination.  Again,
just like his claims about drug testing and the conversation

about him calling out of work, Plaintiff has not presented evidence beyond his own subjective perceptions as to Defendant's discriminatory motivations.

It is undisputable that a hanging noose in a workplace can be reasonably interpreted as a racial threat.  However, even when accepting as true that an employee of Defendant nailed the noose to the bolt trailer's wall, and that employee intended the noose to be a racial threat, Plaintiff has not provided any evidence to refute that Defendant investigated the incident and determined that the person responsible for the noose could not be identified, determined that it was an isolated incident, and although it appeared that the noose could have been fashioned for a legitimate purpose, Defendant would continue to keep a look-out for such an item going forward.

An employer is only negligent if it "knew or should have known about the [Title VII-violative conduct of its employees], but failed to take prompt and adequate remedial action." Andreoli v. Gates, 482 F.3d 641, 644 (3d Cir. 2007).  The evidence here shows that Defendant immediately responded to Plaintiff's complaint about the noose by having it removed, discussed the situation among management, investigated the circumstances of its appearance, and formulated a plan to be aware of any other similar items in the future.  An employer's investigation into a employee's complaint need not be perfect,

Greer v. Mondelez Global, Inc., 590 F. App'x 170, 174 (3d Cir. 2014) (citing Knabe v. Boury Corp., 114 F.3d 407, 412 (3d Cir. 1997)), and "an employee cannot dictate that the employer select a certain remedial action," Knabe, 114 F.3d at 414 (citing Saxton v. AT&T Co., 10 F.3d 526, 535 (7th Cir. 1993)) (agreeing with the Seventh Circuit that: "No doubt, from [the plaintiff's] perspective, [the defendant] could have done more to remedy the adverse effects of [the employee's] conduct. But Title VII requires only that the employer take steps reasonably likely to stop the harassment."). Plaintiff has not pointed to any evidence to show how Defendant could have undertaken a different approach to the situation, and that Defendant's chosen course of action was evidence of discriminatory intent. Consequently, Plaintiff's claims relating to the noose fail as a matter of law.

Finally, Plaintiff's claim regarding his altercation with a white co-worker is also unavailing. On February 8, 2014, two weeks after the noose incident, Plaintiff was punched in the face by Steven Riggs, a foreman who is white, in the safety trailer at a worksite in Eddystone, Pennsylvania. Plaintiff and Riggs were both suspended for the week it took Defendant to investigate the incident. Defendant took statements from the employees who witnessed the altercation, including Plaintiff's uncle. Defendant also memorialized a conversation between

14

Plaintiff and the father and son owners, James and Chris

Daloisio.

Ronald Brown related, in part:

Steve Riggs bumped my nephew Jesse Brown pretty hard after
coming out of a small back area Jesse Brown then said you
don't do that again Steven Riggs turn around and said Fuck
you Bitch and it got pretty out of hand Both guys started
walking towards each other and Steve turns around Red face
and they Both grab each other I'm Jesse uncle I said to him
trying to separate them I witness Steve Riggs thro the
first punch I then told my nephew don't swing and he didn't
some of the guy began to try to separate them which they
did.

(Docket No. 47 at 12.)

Defendant's memo provides:

We started off by telling Jessie that Steve Riggs had been
terminated for his throwing the punch at Jessie.  We asked
Jessie to tell us his story as to what happened that
morning.

Jessie said Steve came in to the safety meeting in the RCC
trailer and went to the back of the trailer.  He said
normally foreman go to the front of the trailer but Steve
came in a little bit late so he went to the back of the
trailer.  When the meeting was over Steve bumped into
Jessie when he was leaving the trailer.  Jessie said "Watch
where you are going'. Steve responded with "F-you Jessie"

Jessie took a few steps toward Steve.  According to Jessie,
to discuss it with him and Steve punched Jessie In the eye,
Jessie said he didn't get a chance to respond to this
because he was grabbed right away, as was Steve by people
in attendance at the meeting.  I told Jessie that it was a
good thing that he didn't respond because he would have
been terminated also.  I asked Jessie how he felt.  He
indicated that he felt fine.  I told Jessie if he ever felt
threatened, in any way that he was immediately to speak
with a foreman or supervisor, or bring it into the office.
He said the biggest problem was that he was embarrassed by
what happened in front of the approximately 20 guys in the
trailer.  Chris and I both told him that from our

interviews with the people that were on site, it indicated to us that it wasn't him that should be embarrassed, they all thought that Steve was the fool. Steve was the one that should have been embarrassed by what happened.

His eye looks fine. No redness or swelling. No black and blue.

I again reiterated that if anything was bothering him to let us know.

We told Jessie that he is to report back to work. Would probably be Monday, but to speak with Dennis [i.e., Riggs] because Monday a lot of places are closed because of the holiday. Also told him he was originally banned from Enbridge, but after we spoke to the people at Enbridge, he is being allowed back on the site.

. . .

After the Interview, Jessie asked if he was going to be paid for the week he was off. We told him NO.

Interview ended at approximately 10:25 JJD&CRD

(Docket No. 47 at 13-14.)[7]

---

[7] During the interview, Plaintiff "said the one thing that was bothering him occurred on 1/23/14. He, Ronnie Brown, Tasha and Mark found a noose hanging in the bolt trailer here in the yard. He said he showed it to Barry Fox, our yard foreman and that he also understood that Barry showed it to Dennis, our superintendent. He showed us a picture of the noose. Chris and I knew nothing about this and we told Jessie that we would look into this." (Docket No. 47 at 14.) Plaintiff admits that immediately after meeting with him, Chris Daloisio spoke with Barry Fox and Dennis Riggs about the noose, and they confirmed that Fox had removed the noose, and since it had been removed, neither had seen anything similar to it in the yard. Plaintiff, however, finds fault – and argues evidences discriminatory motive – with the fact that James and Chris Daloisio had not been informed of the noose incident two weeks earlier. The Court does not find that the company owners' lack of knowledge of the noose incident shows discriminatory animus toward Plaintiff, particularly because the owners investigated Plaintiff's concern immediately after he related the incident to them.

As a result of the altercation, Plaintiff was suspended for one week without pay during the investigation, but was permitted to resume work the following week.  Steve Riggs was terminated, but was rehired two months later.

Plaintiff claims that Riggs hit him because he is African-American and could get away with it.  Plaintiff further claims that if Riggs were African-American, he would not have been rehired.  Plaintiff further faults Defendant for allowing Riggs to leave before the police arrived, by not drug testing Riggs, by not alerting Plaintiff's emergency contacts, and not providing Plaintiff with transportation for medical treatment. Plaintiff finally claims that because of the altercation and ultimately permitting Riggs to return to work, along with the noose incident, conversation about his absences, and drug testing, he had no alternative but to quit his job with Defendant.

As with Plaintiff's claim that Defendant did not perform an adequate investigation into the noose incident, the basis for Plaintiff's complaint about how Defendant handled the fight rests solely on his own subjective perceptions at to what Defendant should have done.  Defendant immediately suspended both parties, took witness statements, and then spoke with Plaintiff about his version of events.  Plaintiff has not

pointed to evidence, other than his own beliefs, that his race

was an issue in the altercation, or that Defendant had

previously handled similar situations in a different way, and

treated white employees more favorably.[8]  Indeed, Defendant

terminated the white employee who struck Plaintiff, and

permitted Plaintiff to return to work, even though Plaintiff and

his uncle both admit that Plaintiff stepped toward Riggs and had

to be pulled away.

Plaintiff's displeasure with Defendant's actions do not

support a claim that Defendant acted with discriminatory intent

or Defendant failed to take prompt remedial action.  See Knabe,

114 F.3d at 414 ("[A]n employer, in order to avoid liability for

the discriminatory conduct of an employee, does not have to

necessarily discipline or terminate the offending employee as

long as the employer takes corrective action reasonably likely

---

[8] Defendants relates that prior to this incident, no employee had
ever hit another employee.  Plaintiff contends that he heard of
another incident where Riggs assaulted a co-worker.  What
Plaintiff heard about another incident, without more detail and
corroboration, is insufficient to show that Plaintiff's race was
a motivating factor in Defendant's handling of the altercation.
See Boykins v. SEPTA, 722 F. App'x 148, 152–53 (3d Cir. 2018)
(quoting Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142
F.3d 639, 644–45 (3d Cir. 1998)) (explaining that proof that a
plaintiff's race was a motivating factor in the employment
decision includes "showing that the employer has previously
discriminated against the plaintiff, that the employer has
discriminated against members of the plaintiff's protected class
or another protected class, or that similarly situated people
not within plaintiff's class were treated more favorably").

to prevent the offending conduct from reoccurring." (citation
omitted)).

Plaintiff argues that when Defendant rehired Riggs,
Defendant demonstrated its racial animus toward Plaintiff and
perpetuated a hostile environment, which provided him with no
alternative other than to leave his job.  Defendant relates that
it rehired Riggs because he completed an anger management class,
was a skilled foreman, and asked for his job back.  Defendant
further relates that Plaintiff never worked with Riggs again
after he returned in April 2014 through Plaintiff's resignation
on June 2, 2014.[9]

The overarching inquiry for constructive discharge is
whether, by virtue of "outrageous, coercive and unconscionable"
conduct, a reasonable person in Plaintiff's position would have
felt compelled to resign.  Kirschling v. Atlantic City Bd. of
Educ., 10 F. Supp. 3d 587, 601 (D.N.J. 2014).  "[T]his is an
objective inquiry  . . . [where] Plaintiff's subjective
perceptions do not govern."  Id. (citing Clowes v. Allegheny
Valley Hosp., 991 F.2d 1159, 1162 (3d Cir. 1993) (other
citations omitted) ("[T]he law does not permit an employee's
subjective perceptions to govern a claim of constructive

_____

[9] Plaintiff admits that he applied for a higher-paying job at
another railroad construction company while employed with
Defendant, and he accepted that position on May 30, 2014.

discharge.").

Because Plaintiff has not provided evidence beyond his
subjective perceptions that his altercation with Riggs was
racially motivated, or that Defendant handled the aftermath of
the altercation in a discriminatory way, and because Plaintiff
never again worked with Riggs, there is insufficient evidence to
show that Plaintiff faced the sort of outrageous, coercive and
unconscionable environment required to demonstrate constructive
discharge.  This is also true even when considering Plaintiff's
complaints regarding the drug testing, work-absence
conversation, and the noose incident.  Consequently, Plaintiff's
claims relating to the fight, as well as his constructive
discharge claim, fail to survive summary judgment.

### CONCLUSION

"Speculation does not create a genuine issue of fact;
instead, it creates a false issue, the demolition of which is a
primary goal of summary judgment."  Boykins v. SEPTA, 722 F.
App'x 148, 158 (3d Cir. 2018) (citing Lexington Ins. Co. v. W.
Pennsylvania Hosp., 423 F.3d 318, 333 (3d Cir. 2005) (quoting
Hedberg v. Indiana Bell Tel. Co., Inc., 47 F.3d 928, 932 (7th
Cir. 1995))).  To show that an invidious discriminatory reason
was more likely than not a cause for Defendant's actions,
Plaintiff "must point to evidence with sufficient probative
force that a factfinder could conclude by a preponderance of the

evidence that [race] was a motivating or determinative factor in the employment decision." Id. (quoting Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644-45 (3d Cir. 1998)). For the reasons expressed above, Plaintiff has failed to do so for all of his claims. Consequently, Defendant's motion for summary judgment must be granted in all respects.

An appropriate Order will be entered.


Date:  November 2, 2018          s/ Noel L. Hillman
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.